IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| LYNETTE JACKSON, | * | |
| Plaintiff, | * | |
| v. | * | |
| SPRINT/UNITED MANAGEMENT COMPANY *et al.*, | * | Civil Action No. RDB-21-0426 |
| | * | |
| Defendants. | * | |
| | * | |

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

## MEMORANDUM OPINION

Plaintiff Lynette Jackson ("Jackson") brings this employment discrimination action against Defendants Sprint/United Management Co. and T-Mobile U.S., Inc. (collectively, "Sprint"), alleging violations of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* Jackson is a former Sprint employee who was diagnosed with multiple sclerosis, and was terminated on February 22, 2019—four days after taking FMLA leave for this condition. (*See* Defs.' Resp. to Req. for Admiss. 1, ECF No. 38-25) Jackson claims that her termination constitutes discrimination on the basis of her disability, and retaliation under both the FMLA and the ADA. (Pl.'s Resp. Opp. Summ. J. 1–2, ECF No. 38.)

Now pending is Sprint's Motion for Summary Judgment (ECF No. 37). In support of this motion, Sprint contends that Jackson cannot establish a *prima facie* case under either the ADA or the FMLA, and argues that she was fired solely for "persistent attendance and performance issues." (Defs.' Mem. Supp. Summ. J. 21–23, ECF No. 37-1; Defs.' Repl. Supp.

Summ. J. 18–19, ECF No. 39.) The parties' submissions have been reviewed and no hearing

is necessary. *See* Local Rule 105.6 (D. Md. 2021). For the reasons set forth below, Sprint's

Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART.**

Specifically, Sprint's motion is granted as to Count II, alleging disability discrimination, and

denied as to Counts I and III, alleging retaliation under the FMLA and the ADA.

## BACKGROUND

Plaintiff Lynette Jackson ("Jackson") was employed as a Retail Sales Consultant for

Defendants Sprint/United Management Co. and T-Mobile U.S., Inc. (collectively, "Sprint")

between January 2018 and February 2019. (Dep. of Lynette Jackson ["Jackson Dep."] 52:6–

9, 252:15–17, 299:17–20, ECF Nos. 37-2, 38-1.) As a Retail Sales Consultant, Jackson was

responsible for facilitating customer sales by activating new phones, upgrading phone lines,

and selling accessories. (Jackson Dep. 13:7–16, 46:11–47:24.) This case arises from Jackson's

termination on February 22, 2019—which Jackson claims was motivated by discrimination

on the basis of her multiple sclerosis and retaliation for her decision to take FMLA leave.

(Resp. Opp. 7, ECF No. 38.)

### I.    Sprint's Attendance Policy and Corrective Action Process

Sprint requires retail personnel to follow a Corrective Action and Attendance Policy.

(Corrective Action and Attendance Policy, ECF No. 37-3.) This policy requires employees to

report to work on time, to adhere to designated meal and break periods, and to notify their

supervisors of an absence at least two hours in advance of a scheduled shift. (*Id.* at 6.)

Employees are authorized a maximum of 40 hours of unscheduled paid time off during each

fiscal year to accommodate "unplanned personal needs such as sick time, personal issues, or

family issues." (*Id.* at 7.)[1] Sprint also provides FMLA-mandated leave to employees who have been employed for at least 12 months and worked at least 1250 hours in the last year. (FMLA & State Leaves 2, ECF No. 37-10; Dep. of Laura Stephens ["Stephens Dep."] 51:17–22.) Managers are expected to encourage employees to take medical leave as necessary and should refrain from discouraging them from using approved FMLA leave. (Dep. of Jose Compean ["Compean Dep."] 106:14–107:2; Stephens Dep. 52:14–53:15.)

Sprint has adopted "a five-step progressive discipline process," (Mem. Supp. 4, ECF No. 37-1), to address performance issues and disciplinary concerns, proceeding through the following sequential stages: (1) coaching;[2] (2) verbal warning; (3) written warning; (4) final written warning; (5) termination. (Corrective Action Policy 2; *see* Jackson Dep. 64:23–65:12.) Each employee's supervisor must record any corrective action document in Sprint's Oasis database, discuss the contents of the document with the employee, send the document to the employee for their acknowledgment, and add the document to the employee's personnel file. (Corrective Action Policy 3; Jackson Dep. 222:9–18; Dep. of Richard Pierce ["Pierce Dep."] 97:10–16, ECF No. 35-16; Gbangbalasa Dep. 76:3–4.)

The Corrective Action Policy is flexible: "Management retains the discretion to place an employee on any level of the corrective action [process] deemed appropriate or proceed directly to termination." (Corrective Action Policy 2.) Nevertheless, corrective action for performance and attendance concerns is ordinarily handled through the five-step pipeline. (*Id.* at 7; Pierce Dep. 97:2–21.) The primary exception to this policy is a "no-call, no-show"

---

[1] Jackson acknowledges that she was made aware of this policy, and her concomitant expectations, at an early stage of her employment. (Jackson Dep. 52:10–14.)

[2] According to Assistant Store Manager Oladapo Gbangbalasa, coaching is also provided informally without pursuing corrective action. (Dep. of Oladapo Gbangbalasa ["Gbangbalasa Dep."] 76:3–4.)

absence—referring to an instance in which an employee was scheduled to work a certain shift but neither showed up nor informed their supervisor that they were unable to work. (Corrective Action Policy 8; Pierce Dep. 105:5–18.) If an employee is deemed a "no-call, no-show," their manager may proceed directly to a written or final written warning. (Corrective Action Policy 8.) Three consecutive "no-call, no-show" absences are construed as voluntary abandonment of employment and result in automatic termination. (*Id.*)

## II.    Jackson's Performance

Lynette Jackson worked at Sprint Store 153 in Columbia, Md., from January 2018 to February 2019. (Jackson Dep. 52:6–9; Dep. of Crystal Cauthen ["Cauthen Dep."] 32:3–9.) As relevant, from April to December 2018, she was supervised by Retail Store Manager Crystal Cauthen and two Assistant Store Managers, Oladapo Gbangbalasa and Adelphus Pryor. (Defs.' Ans. to Pl.'s First Set of Interrogs. No. 4, ECF No. 38-11; *see also* Cauthen Dep. 32:3–16; Dep. of Adelphus Pryor ["Pryor Dep."] 34:1–34:21, ECF Nos. 37-18, 38-19.)[3] On December 11, 2018, Cauthen was transferred to another store. (Defs.' Ans. No. 4; Cauthen Text Messages 121–24, ECF No. 37-8.) Jose Compean replaced her as Retail Store Manager, while Gbangbalasa and Pryor continued as Assistant Store Managers. (Defs.' Ans. No. 4.) Jackson was fired on February 22, 2019, three months after Compean became her manager. (Jackson Dep. 253:3–9.)

Retail Sales Consultants are "expected to provide a total sales solution to Sprint's customers[] for any of their wireless/mobility needs," (Defs.' Ans. No. 5), by activating new

---

[3] At the time Jackson was hired, Gbangbalasa and Pryor were employed as Retail Sales Supervisors. (Defs.' Ans. No. 4.) Gbangbalasa was promoted to Assistant Store Manager on June 9, 2018; Pryor was promoted to Assistant Store Manager on November 24, 2018. (*Id.*)

phones, upgrading phone lines, and selling accessories, (Jackson Dep. 13:7–16, 46:11–47:24). Accordingly, Retail Sales Consultants are held to monthly sales goals. (*Id.* 13:7–16.) Jackson's supervisors testified that it is not realistic to expect staff to meet their goals every month. (Cauthen Dep. 91:7–15; Compean Dep. 107:6–108:22; Gbangbalasa Dep. 76:16–21; Pryor Dep. 88:17–89:2.) Pryor testified that store managers routinely provide "one-on-one, on-the-spot coaching" to train retailers who are falling behind their goals. (Pryor Dep. 89:12–18.) Cauthen opined that "it's impossible to meet and exceed a metric every single time, and it's [the manager's] job as a leader to coach and develop [employees] to . . . meet and exceed [their] metrics." (Cauthen Dep. 91:7–15.) Additionally, Gbangbalasa noted that employees do not ordinarily receive corrective action until they have demonstrated consecutive months of poor performance. (Gbangbalasa Dep. 78:7–17.)

The parties disagree about whether Jackson was performing adequately in this role. Jackson was coached by Gbangbalasa once, and Pyror twice, for failing to reach her goals. (Jackson Dep. 86:19–88:5; Coaching Log, ECF No. 37-7.) However, Jackson insists that she was never reprimanded, and that she "received a lot of positive acknowledgments . . . from her management team." (Jackson Dep. 69:13–72:20, 86:5–18.) To varying degrees, her supervisors characterized her as a reliable employee based on "her sales performance, . . . referring to activations, upgrades, accessories protections, [] customer upgrades, and customer satisfaction." (Gbangbalasa Dep. 79:13–20, 83:7–8; *see also* Pierce Dep. 108:13–16; Cauthen Dep. 101:15–21; Compean Dep. 118:11–119:8, 120:10–121:6.) Cauthen praised Jackson's performance, expressed interest in hiring her as an assistant store manager, and expanded her responsibilities by selecting her to serve as a "small business expert." (Cauthen

Dep. 101:15–21, 103:11–19, 125:1–5; Cauthen Text Messages 3–4, 10–11, 45–46, 81–85, 129, 147, 150.) Compean highlighted Jackson in two email chains celebrating top sellers for priority devices—including on February 16, 2019, less than one week before her termination. (Compean Dep. 118:11–119:8, 120:10–121:6; Sales Emails, ECF Nos. 38-16, 38-17.) Gbangbalasa commented that he wished he could "clone" Jackson due to her ability to close accounts and build rapport with customers. (Gbangbalasa Dep. 88:1–89:12.)

### III.    Jackson's Multiple Sclerosis and FMLA Leave

Jackson suffers from multiple sclerosis ("MS"), a chronic and episodic neurological condition that leaves her immunocompromised and produces several debilitating symptoms. (Jackson Dep. 88:6-22; Certification of Health Care Provider 3–4, ECF No. 38-2; Sprint's Resp. to Req. for Admiss. 1, ECF No. 38-25.) Jackson was diagnosed in 2011, at the age of 19, and has been seeing Drs. Rabin and Fox of Johns Hopkins Neurology for this condition since 2012. (Jackson Dep. 214:12; Certification 3–4.) As a result of her multiple sclerosis, Jackson commonly experiences "numbness, skin infections, nosebleeds, chronic fatigue, and optic neuritis." (Resp. Opp. 3; Jackson Dep. 217:6–219:24.) At times, these conditions leave Jackson too ill to work. (Certification 3–4.) Accordingly, Jackson insists that "it's really important for [her] to take time when [she is] ill to get well or it could [escalate]." (Jackson Dep. 232:14–233:19.)

The parties disagree as to who knew that Jackson suffers from MS. Jackson testified that she promptly informed Cauthen, Compean, Pryor, and Gbangbalasa of her condition. (Gbangbalasa Dep. 55:8–59:3, 60:12–64:3; Jackson Dep. 219:25–220:21, 223:11–17.) Jackson informed Cauthen about her condition shortly after Cauthen became Retail Store Manager—

and Cauthen "allowed [her] to take time off when needed to address the symptoms that accompany MS." (Resp. Opp. 3; Cauthen Dep. 72:5–6; *see, e.g.*, Cauthen Text Messages 2–4, 38–40, 49, 99.) Additionally, she claims she informed Compean about her disease following three days of absence with the flu shortly after he became manager. (Jackson Dep. 140:5–23, 141:3–142:3, 233:16–234:4.) Compean and Pryor deny having knowledge of her disorder at the time of her termination, (Compean Dep. 62:21–63:3; Pryor Dep. 161:11–15), but Sprint acknowledges that Compean and Pryor knew she had a disability in January 2019, and that she was approved to take FMLA leave. (Defs.' Ans. No. 12; Defs.' Resp. to Req. for Admiss. 4–7, ECF No. 38-25; *see also* Stephens Dep. 78:17–22.)

On January 14, 2019, shortly after Jackson accumulated the twelve months' employment necessary to be eligible for FMLA leave, she emailed Sprint's Leave Management Group to request intermittent FMLA leave to ameliorate the symptoms of her MS as they arise. (FMLA Request, ECF No. 38-21.) That same day, Sprint informed Jackson that she was eligible to formally apply. (FMLA Eligibility Notice, ECF No. 37-12.) Jackson applied for FMLA leave on February 1, 2019, requesting 1-3 days of leave every 3-6 months, consistent with her doctor's recommendation. (FMLA Application, ECF No. 37-13; Certification 4.) Sprint approved this application on February 7, 2019, and Jackson first activated her FMLA leave on February 17 and 18. (FMLA Approval, ECF Nos. 37-14, 38-22; Timesheets, ECF No. 37-15, 38-23.) Jackson was terminated on February 22, 2019—two weeks after her FMLA leave was approved, and four days after it was exercised. (Jackson Dep. 253:3–9.)

7

In addition, Jackson testified that Compean and Pryor commented about her illness and disparaged her condition "almost every time [they] saw [her]." (Resp. Opp. 4–5; Jackson Dep. 241:9–243:9.) This began when Compean asked her "why are you always sick" after she had been out with the flu. (Jackson Dep. 233:16–234:17.) After Jackson informed Compean of her condition, she claims that Compean consistently questioned her ability to finish her work, characterized her sick days as vacation days, insinuated that she was falsifying her illness, and joked that she made her own work schedule. (*Id.* 231:22–234:17, 233:16–236:14, 240:21–241:23.) Additionally, Jackson alleges that Compean told her that she would have to "work past" her symptoms, (*id.* 231:23–232:3), pressured her not "to take advantage of [her FMLA leave] in a bad way," and told her that doing so would "stunt her growth" at the company, (*id.* 236:18–240:11).

## IV.  Jackson's Termination

Sprint contends that Jackson had punctuality issues throughout her employment. According to Compean, Jackson arrived late as often as three to four times each week, sometimes by as much as 10 to 30 minutes. (Compean Dep. 188:19–189:13.) According to Gbangbalasa, Jackson was late at least once per week and took liberties with lunch breaks. (Gbangbalasa Dep. 128:14–129:6, 132:1–15.) Additionally, Cauthen counseled Jackson on August 29, 2018, that she had accumulated 104 hours of unscheduled paid time off— considerably more than the 40 authorized by company policy—and that further absenteeism would result in corrective action. (Coaching Log.) Gbangbalasa coached Jackson again on November 2, 2018 and reiterated Cauthen's admonition. (*Id.*) By the time Cauthen departed

as manager, Jackson had accumulated 120 hours of unscheduled paid time off. (Cauthen Text Messages 99.)

Jackson attributes her tardiness to issues beyond her control, argues that Cauthen was flexible in her implementation of Sprint's attendance policy, and notes that her managers encouraged her to apply for FMLA leave for her MS. (*Id.*; Jackson Dep. 75:7–10, 77:1–13, 124:12–25.) She insists that "[h]er late arrivals were usually related to her [multiple sclerosis] and the sickness that accompanies that episodic, chronic condition." (Resp. Opp. 7). Across 150 pages of text messages with Cauthen, Plaintiff attributes her tardiness to MS symptoms such as nosebleeds, eye conditions, stomach issues, and flus, (Cauthen Text Messages 2-3, 4–7, 38-40, 46–47, 49, 74, 84-85), as well as unrelated circumstances such as traffic concerns, vehicle issues, family emergencies, construction, a bank account problem, an alarm, errands, her dog, and a flooded basement, (*id.* at 2–3, 8–9, 16–17, 21, 26–27, 34, 42–44, 85, 99). Additionally, her managers note that "occasional tardiness was commonplace among the employees" at Store 153, that they could not precisely recall how often employees were late, and that they were often late themselves. (Compean Dep. 146:13–147:9; Cauthen Dep. 184:6–186:18; Gbangbalasa Dep. 109:21–110:2.)

On February 20, 2019, two days after Jackson took FMLA leave, Compean requested permission to dismiss her. (Pierce Dep. 87:10–21, 146:6–9; Compean Dep. 165:8–14.)[4] Compean informed Regional Manager Brian Pierce that Jackson had been issued corrective action for attendance on three occasions: (1) "verbal for performance;" (2) "written for

---

[4] Sprint acknowledges that Compean was the ultimate decisionmaker in Jackson's termination, with Regional Manager Brian Pierce and his supervisor, Eren Beltran, signing off and playing supporting roles. (Stephens Dep. 167:3–168:6.)

calling out to go to her cousin's birth;" (3) "final for leaving lunch and not coming back plus SST performance." (Termination Email, ECF No. 37-17.) However, the only corrective action document Sprint was able to produce during discovery is a "First Level-Oral/Verbal Notice" dated February 22, 2019—the day Jackson was terminated, two weeks after she was approved for FMLA leave, and four days after she first took leave. (Jackson Dep. 252:15-17; Verbal Notice, ECF No. 38-29.) At the time, Compean, Pierce, and Beltran were all aware that Jackson had taken FMLA leave. (Stephens Dep. 78:17–22, 80:13–18.)

Sprint claims that Jackson was fired for attendance and performance issues. (Stephens Dep. 169:15-22.) Compean and Pierce concur but offer different accounts of the facts. Compean testified that Jackson was fired for "attendance issues for nonmedical reasons." (Compean Dep. 62:7–22, 168:22–169:19.) He cites three incidents that led to her discharge: a late arrival when her dog was injured, a late arrival to pick up a birthday cake, and an incident when she left lunch and did not return. (*Id.* 169:7–19.) Jackson contends that one absence occurred when she was not scheduled to work, and that her lunch departure was due to an uncontrollable nosebleed brought on by her multiple sclerosis. (Jackson Dep. 181:2–186:1; Compean Text Messages, ECF No. 38-20.) Pierce testified that Jackson was terminated for three "no-call, no-shows." (Pierce Dep. 101:19–102:2, 111:7–9.) Jackson contends that this never occurred, and Compean testified that Jackson may have been a no-call, no-show on at most one occasion. (Jackson Dep. 267:3–14; Compean Dep. 172:20–174:22.) Both managers acknowledged that these stated reasons were the only justifications for Jackson's termination. (Pierce Dep. 116:21–117:3; Compean Dep. 168:22–169:19.)

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A genuine dispute over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. When considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249. Trial courts in the Fourth Circuit have an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).

In undertaking this inquiry, this Court must consider the facts and all reasonable inferences "in the light most favorable to the nonmoving party." *Libertarian Party of Va.*, 718 F.3d at 312; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007). This Court "must not weigh evidence or make credibility determinations." *Foster v. Univ. of Md.-Eastern Shore*, 787 F.3d 243, 248 (4th Cir. 2015) (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)); *see also Jacobs v. N.C. Admin. Off. of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015) (explaining that a trial court may not make credibility determinations at the summary

judgment stage). Indeed, it is the function of the factfinder to resolve factual disputes, including issues of witness credibility. *See Tolan v. Cotton*, 134 S. Ct. 1861, 1866–68 (2014).

## ANALYSIS

"[T]he ultimate question in every employment discrimination case . . . is whether the plaintiff was the victim of intentional discrimination." *Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 286 (4th Cir. 2004) (quoting *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 153 (2000)). To avert summary judgment, Jackson must either (a) provide direct or indirect evidence that discrimination motivated the challenged adverse employment decision; or (b) apply the three-step burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to establish that the employer's proffered reason for the decision was a pretext for unlawful discrimination. *Hill*, 354 F.3d at 284–86; *accord Raytheon Co. v. Hernandez*, 540 U.S. 44, 50–52 (2003). The first method of proof requires "evidence of conduct or statements that both reflect directly on the alleged discriminatory attitude and . . . bear directly on the contested employment decision." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006) (quoting *Taylor v. Virginia Union Univ.*, 193 F.3d 219, 232 (4th Cir. 1999) (en banc)). The second method applies "where a plaintiff does not present sufficient direct or circumstantial evidence showing that an adverse employment action was motivated by intentional discrimination." *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Such is the case here.

As the United States Court of Appeals for the Fourth Circuit articulated in *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208 (4th Cir. 2016), the *McDonnell Douglas* framework requires a three-step analysis:

> (1) the plaintiff must first establish a prima facie case of employment
> discrimination or retaliation; (2) the burden of production then shifts to the
> employer to articulate a non-discriminatory or non-retaliatory reason for the
> adverse action; (3) the burden then shifts back to the plaintiff to prove by a
> preponderance of the evidence that the stated reason for the adverse
> employment action is a pretext and that the true reason is discriminatory or
> retaliatory.

828 F.3d 208, 206; *accord Jones v. Lowe's Co., Inc.*, 845 F. App'x 205, 213 (4th Cir. 2021); *Spencer v. Va. St. Univ.*, 919 F.3d 199, 208 (4th Cir. 2019); *Abilt v. CIA*, 848 F.3d 305, 315 (4th Cir. 2017). Additionally, a plaintiff cannot rely solely "on [her] 'own assertions of discrimination'" to establish pretext at the summary judgment stage. *Adam v. Trs. of Univ. of N.C. Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011). Rather, the plaintiff must offer evidence both that the employer's proffered reason is false, and that it is a pretext for discrimination or retaliation. *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 252 (4th Cir. 2015) (citing *Jimenez v. Mary Wash. Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)).

Jackson claims her termination violates the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* and the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.*, both of which are governed by the *McDonnell-Douglas* framework. *See Vannoy v. Fed. Rsrv. Bank of Richmond*, 827 F.3d 296, 304 (4th Cir. 2016) (FMLA); *Adams v. Anne Arundel Cnty. Pub. Schs.*, 789 F.3d 422, 429 (4th Cir. 2015) (ADA). Jackson claims that: (1) she was terminated in retaliation for taking FMLA leave; (2) she was wrongfully discharged on the basis of her disability; and (3) she was terminated in retaliation for requesting a reasonable accommodation for her MS. (Compl. ¶¶ 29–61.) Sprint contends that Jackson cannot establish the causation element of each claim and argues that Sprint's facially neutral justification for her firing is undisputed.

(Mem. Supp. 21–23.) Although Jackson fails to present a *prima facie* case for discrimination, both retaliation claims survive summary judgment.

## I.      Family and Medical Leave Act

In Count I, Jackson alleges retaliation under the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* (Compl. ¶¶ 29–40.) "The FMLA entitles eligible employees to take twelve weeks of leave during any twelve-month period for a 'serious health condition that makes the employee unable to perform the functions' of his job." *Vannoy v. Fed. Rsrv. Bank of Richmond*, 827 F.3d 296, 301 (4th Cir. 2016) (quoting 29 U.S.C. § 2612(a)(1)(D)). "These substantive rights, and their accompanying protections . . . are prescriptive, 'set[ting] substantive floors for conduct by employers, and creating entitlements for employees.'" *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 546 (4th Cir. 2006) (quoting *Hodgens v. Gen. Dyn. Corp.*, 144 F.3d 151, 159 (1st Cir. 1998)) (alteration in original). In addition, the FMLA "also contains *proscriptive* provisions that protect employees from discrimination or retaliation for exercising their substantive rights." *Id.* Jackson does not claim that Sprint interfered with the exercise of her FMLA rights—only that Sprint retaliated against her for requesting, receiving, and taking FMLA leave.[5]

### A. *Prima Facie* Retaliation

"Retaliation claims brought under the FMLA are analogous to those brought under Title VII." *Adams v. Anne Arundel Cnty. Pub. Sch.*, 789 F.3d 422, 429 (4th Cir. 2015). A *prima*

---

[5] "The distinction between an interference claim and a retaliation claim under the FMLA 'is not always clear.'" *Courtney-Pope v. Bd. of Educ. of Carroll Cnty.*, No. ELH-16-4055, 2019 WL 4447246, at *20 (D. Md. Sept. 17, 2019) (quoting *Edusei v. Adventist Healthcare, Inc.*, Civ. No. DKC-13-0157, 2017 WL 3345051, at *6 (D. Md. July 7, 2014)) "[T]he interference claim merely requires proof that the employer denied the employee [her] entitlements under the FMLA, while the retaliation claim requires proof of [the employer's] retaliatory intent." *Id.* (quoting *Sherif v. Univ. of Md. Med. Ctr.*, 127 F. Supp. 3d 470, 447 (D. Md. 2015)) (emphasis in original).

*facie* case of retaliation requires Jackson to show that "(1) she engaged in a protected activity; (2) her employer acted adversely against her; and (3) her protected activity was causally connected to her employer's adverse action." *Rhoads v. FDIC*, 257 F.3d 373, 392 (4th Cir. 2001). It is undisputed that Jackson engaged in a protected activity by requesting and activating her FMLA leave. (FMLA Request; FMLA Approval; Timesheets.) It is equally undisputed that Sprint acted adversely against her by terminating her on February 22, 2019. (Jackson Dep. 252:15–17.) Nevertheless, Sprint contends that Jackson has failed to generate sufficient evidence of a causal connection between these elements—namely, that Sprint terminated her *because* she took FMLA leave. (Mem. Supp. 12.)

"Retaliation claims . . . require the employee to show 'that retaliation was a but-for cause of a challenged adverse employment action.'" *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 217 (4th Cir. 2016) (quoting *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 252 (4th Cir. 2015)). "[C]lose temporal proximity between activity protected by the [FMLA] and an adverse employment action may suffice to demonstrate causation." *Waag v. Sotera Def. Sols., Inc.*, 857 F.3d 179, 192 (4th Cir. 2017); *accord Smith v. CSRA*, 12 F.4th 396, 417 (4th Cir. 2021) ("The existence of relevant facts alone, or together with temporal proximity, may be used to establish a causal connection between the protected activity and the adverse action." (quoting *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 123 (4th Cir. 2021))). For example, in *Rhoads v. F.D.I.C.*, 257 F.3d 373 (4th Cir. 2001), the Fourth Circuit held that a retaliation claim survived summary judgment where the employee offered evidence that her manager warned her she'd "regret" contacting an attorney for disability accommodations, and she was fired less than a week after requesting sick leave. 257 F.3d at 378, 392–93. Similarly, in *Raith*

*v. Johns Hopkins University*, 171 F. Supp. 2d 515 (D. Md. 2000), this Court denied summary judgment on a retaliation claim by observing that the plaintiff's manager had expressed hostility towards her FMLA leave, and that the plaintiff had been fired after being assured her position was not in danger. 171 F. Supp. 2d at 520.

Jackson has presented sufficient evidence to generate a genuine a dispute of material fact on the issue of causation. As Jackson notes, "Mr. Compean terminated [her] just three weeks after she applied for FMLA leave, a little over two weeks after she was approved for FMLA leave, and just four days after she used her FMLA leave." (Resp. Opp. 15.) Even standing alone, this temporal proximity is likely sufficient to generate a reasonable inference of but-for causation at the summary judgment stage. *Waag*, 857 F.3d at 192. Moreover, as in *Raith* and *Rhoads*, this inference is compounded by Compean's admonition that Jackson not "take advantage [of her FMLA leave] in a bad way," as doing so may "stunt her growth" at the company. (Jackson Dep. at 236:18–240:11.) Viewed in the light most favorable to Jackson, these statements suggest Compean harbored hostility towards Jackson's FMLA leave—hostility that may have directly resulted in her termination when she failed to comply. *Cf. Rhoads*, 257 F.3d at 394 ("Viewed in the proper light, the record establishes that once Rhoads failed to heed Jones's warning not to consult an attorney, she was terminated, purportedly for excessive unexcused absenteeism, even though her fellow employees had not been discharged for the same conduct."). Accordingly, "both the relevant facts and the temporal proximity of events" are sufficient to generate a genuine dispute on the issue of causation, *Smith*, 12 F.4th at 417, and support a prima facie case of FMLA retaliation at the summary judgment stage.

B. <u>Justification and Pretext</u>

In the alternative, Sprint contends that Jackson "cannot establish that the legitimate, nondiscriminatory reasons for her termination were a pretext for retaliation." (Mem. Supp. 13.) As discussed above, FMLA retaliation claims are "evaluated under the burden-shifting framework set out in *McDonnell Douglas*." *Vannoy*, 827 F.3d at 304. "If the defendant advances a lawful explanation for the alleged retaliatory action, the plaintiff must demonstrate that the defendant's reason for taking the adverse employment action was pretextual." *Adams*, 789 F.3d at 429. To establish pretext at the summary judgment stage, a plaintiff may either show that the employer's stated justification is "unworthy of credence," or offer additional circumstantial evidence of discrimination. *Mereish v. Walker*, 359 F.3d 330, 336 (4th Cir. 2004) (quoting *Texas Dep't of Cnty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). In this case, Sprint claims that Jackson was lawfully terminated for her "demonstrated uncorrected attendance and performance issues." (Mem. Supp. 14.) Jackson offers evidence that this justification is pretextual, highlighting several deficiencies that suggest Sprint's version of events is "unworthy of credence." (Resp. Opp. 18.) These deficiencies are sufficient to overcome Sprint's summary judgment motion.

First, Sprint claims that Jackson was fired for "'ongoing performance' issues." (Mem. Supp. 13, 15.) Consistent with this claim, Jackson was coached in December 2018 and February 2019 for failing to achieve her sales commitments, and received a corrective action warning for attendance and performance on the day of her termination. (Jackson Dep. 86:19–88:5; Coaching Log; Verbal Warning.) Nevertheless, as noted above, each of Jackson's supervisors acknowledged that it is "not realistic" to expect Retail Sales Consultants to reach

their goals every month, (Cauthen Dep. 91:7–15; Compean Dep. 107:6–108:22; Gbangbalasa Dep. 76:16–21; Pryor Dep. 88:17–89:2), and those same supervisors testified that she was a strong performer. (Cauthen Dep. 101:15–21; Compean Dep. 120:10–121:6; Gbangbalasa Dep. 79:13–20; Pierce Dep. 108:13–16.) Additionally, during a coaching on February 14, 2019, Pryor warned Jackson that a failure to improve her sales numbers by end of the month would result in corrective action. (Coaching Log.) She was fired only eight days later. These details, viewed in the light most favorable to Jackson, are sufficient for a jury to find that her performance was not deficient, and that any putative deficiencies did not motivate her termination in any event.

Second, Sprint argues that "[Jackson] had recurrent attendance issues for the entirety of her employment with Sprint." (Mem. Supp. 19.) The record suggests Jackson was tardy as many as sixteen times during the eight months preceding her termination—often for reasons unrelated to her medical issues. (*Id.*; *see* Tardiness Text Messages, ECF No. 37-9.) Cauthen admitted that Jackson may have been in violation of the Attendance Policy, and that she had accumulated 120 hours of unscheduled paid time off in 2019. (Cauthen Dep. 216:8–11; Cauthen Text Messages 99; Coaching Log.) Compean testified that Jackson arrived late three to four times every week, occasionally as much as 10 to 30 minutes after her shift was scheduled to commence. (Compean Dep. 188:15–189:13; Jackson Dep. 138:15–20.) Additionally, on February 20, 2019, Compean informed Pierce that he had already issued Jackson three corrective action documents—including a verbal warning for performance, a written warning for calling out to attend her cousin's birth, and a final written warning for leaving lunch without returning. (Termination Email.)

18

As an initial matter, Jackson notes that Compean and Pierce gave "inconsistent post-hoc explanations" for her termination. *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 647 (4th Cir. 2002); *accord Smith v. Caesars Balt. Mgmt. Co.,* LLC, No. ELH-17-3014, 2019 WL 3766529 (D. Md. Aug. 9, 2019) (noting that "an employer providing 'different justifications at different times for [an adverse employment action] is, in and of itself, probative of pretext' for FMLA retaliation under the *McDonnell Douglas* framework" (quoting *Jacobs v. N.C. Admin. Off. of the Courts*, 780 F.3d 562, 576 (4th Cir. 2015)) (alteration in original)). Although both managers cited attendance-related concerns, Compean testified that she was terminated due to nonmedical tardiness, while Pierce testified that she was fired following three consecutive "no-call, no-show" absences. (*Compare* Compean Dep. 168:22–169:3, *with* Pierce Dep. 101:19–102:2, 111:7–9.) However, Compean could recall at most one occasion on which Jackson was "no-call, no-show" (Compean Dep. 172:20–174:22), and Jackson has offered evidence that one of the absences Compean referred to was related to her condition, while another took place on a day she was not scheduled, (*id.* at 181:2–189:6; Compean Text Messages.) These deficiencies in Sprint's attendance justification create disputes of fact that are appropriately reserved for the jury.

More critically, Jackson argues that Sprint violated its progressive discipline policies. (Resp. Opp. 2.) Pursuant to the Corrective Action Policy, managers are ordinarily required to issue a coaching, a verbal warning, a written warning, and a final written warning before terminating an employee. (Mem. Supp. 4; Attendance Policy 016443.) Although the policy provides managers some discretion to skip the steps in this pipeline and proceed directly to termination, Sprint insists—and Compean represented to Pierce—that Jackson had received

each of these warnings. (Mem. Supp. 4; Termination Email.) However, the only corrective action document Sprint was able to produce during discovery is a "First Level-Oral/Verbal Notice" issued February 22, 2019—the very day Jackson was terminated. (Verbal Notice, ECF No. 38-29.) Jackson insists that she has not seen this Notice, and it does not bear her signature. (*Id.*; Jackson Dep. 260:5–23.) Viewed in the light most favorable to Jackson, the absence of a Written Warning or Final Written Warning and the timing of this "First Level Oral/Verbal Notice" creates a genuine dispute as to whether Compean's representations in his February 20, 2019 email are false, and the reasons for Jackson's discharge are pretextual. Accordingly, Sprint's Motion for Summary Judgment is hereby **DENIED** as to Count I.

## II.   Americans with Disabilities Act

In Counts II and III, Jackson raises claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* (Compl. ¶¶ 41–61.) The ADA provides that no employer may "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). In Count II, Jackson contends that her termination was motivated by her multiple sclerosis, in violation of the ADA's substantive guarantees. (Compl. ¶¶ 44–49; Resp. Opp. 8, 23–24.) In Count III, she alleges retaliation, arguing that her request for FMLA leave constitutes a reasonable accommodation under the ADA. (Compl. ¶¶ 52-60; Resp. Opp. 27.) Sprint argues that Jackson has failed to establish discrimination or causation, that she did not perform her responsibilities at a level that met her employer's legitimate expectations, and that she cannot rebut Sprint's legitimate, nondiscriminatory reason for her termination.

(Mem. Supp. 18–19.) Jackson's retaliation claim survives summary judgment—while her wrongful discharge claim falls short.

A. <u>Wrongful Discharge</u>

Jackson claims that Sprint discriminated against her by terminating her on the basis of her disability. (Compl. ¶¶ 44, 46.) A prima facie case for wrongful discharge requires Jackson to show that: "(1) [she] is within the ADA's protected class; (2) [she] was discharged; (3) at the time of [her] discharge, [she] was performing the job at a level that met [her] employer's legitimate expectations; and (4) [her] discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination." *Coursey v. Univ. of Md. E. Shore*, 577 F. App'x 167, 174 (4th Cir. 2014) (citing *Haulbrook v. Michelin N. Am., Inc.*, 252 F.3d 696, 702 (4th Cir. 2001)); *Harris v. Reston Hosp. Ctr., LLC*, 523 F. App'x 938, 947 (4th Cir. 2013) (per curiam); *EEOC v. Manu. & Traders Tr. Co.*, 429 F. Supp. 3d 89, 117 (D. Md. 2019). This *prima facie* case encompasses an implicit causation element: To support a wrongful discharge claim, the plaintiff's disability must be a "but-for" cause of her termination. *Gentry v. E.W. Partners Club Mgmt. Co., Inc.*, 816 F.3d 228, 235–36 (4th Cir. 2016). "Sprint does not dispute that Plaintiff's multiple sclerosis is a qualified disability under the ADA or that Plaintiff's termination was an adverse employment action." (Mem. Supp. 18.) Rather, Sprint contests each of the remaining elements, arguing that Jackson was not qualified for her position, was not performing adequately, and is unable to establish discrimination or causation. (*Id.*)

It is unnecessary to address whether Jackson falls under the ADA's protected class or to adjudicate her job performance, as she fails to produce sufficient evidence of disability discrimination or causation. Jackson's case on these elements relies entirely on remarks from

Compean and Pryor, who she claims made an "ongoing joke" out of her MS. (Resp. Opp. 4–5; Jackson Dep. 240:14–241:17.) Jackson claims that Compean commented on her disability nearly every time they interacted, and that Pryor followed suit. (Jackson Dep. 241:9–242:16.) The putative remarks include asking "why are you always sick?;" characterizing Jackson's sick days as "vacation days;" insinuating that she makes her own schedule; and questioning her ability to finish her work. (*Id.* 231:22–234:17, 234:21–236:14, 241:9–17.) Construed in the light most favorable to Jackson, these comments could suggest a discriminatory motive— and their temporal proximity to her discharge could indicate causation. *Cf. Smith*, 12 F.4th at 417; *Waag*, 857 F.3d at 192 (each highlighting importance of temporal proximity).

Nevertheless, a plaintiff's "own naked opinion, without more, is not enough to establish a *prima facie* case of [] discrimination." *Evans v. Tech. Applications & Servs. Co.*, 80 F.3d 954, 959 (4th Cir. 1996) (citing *Goldberg v. B. Green & Co., Inc.*, 836 F.2d 845, 848 (4th Cir. 1988)) (alteration in original); *Mackey v. Shalala*, 360 F.3d 463, 469–70 (4th Cir. 2004) ("A plaintiff's own self-serving opinions, absent anything more, are insufficient to establish a *prima facie* case of discrimination."). In her Response in Opposition, Jackson exclusively relies on her testimony as evidence of the alleged remarks. (Resp. Opp. 4–5 (exclusively referencing Jackson's deposition)). Absent anything more, this evidence "is not sufficiently probative to raise a genuine issue of material fact on the issue of . . . discriminatory animus," much less on the critical issue of causation. *Harris v. Home Sales Co.*, 499 F. App'x 285, 291 (4th Cir. 2012). Accordingly, Sprint's Motion for Summary Judgment is hereby **GRANTED** as to Count II.

B. <u>Retaliation</u>

In Count III, Jackson claims that she was terminated in retaliation for requesting an accommodation for her disability—namely, her request for intermittent FMLA leave. (Compl. ¶¶ 52–60.) Under the ADA, as with the FMLA, a *prima facie* case for retaliation requires Jackson to establish that "(1) she engaged in a protected activity; (2) her employer acted adversely against her; and (3) her protected activity was causally connected to her employer's adverse action." *Rhoads v. FDIC*, 257 F.3d 373, 392 (4th Cir. 2001); *accord Reynolds v. Am. Nat. Red Cross*, 701 F.3d 143, 154 (4th Cir. 2012); *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 577 (4th Cir. 2015) (holding that "requesting an accommodation" constitutes protected activity). As noted in the preceding analysis of Jackson's FMLA claim, Jackson's termination is undisputed—and the temporal proximity between her FMLA leave and her termination creates a reasonable inference of causation. *See Waag*, 857 F.3d at 192 ("[C]lose temporal proximity between activity protected by the [ADA] and an adverse employment action may suffice to demonstrate causation."). Accordingly, the viability of Jackson's ADA retaliation claim turns entirely on whether a request for FMLA leave can constitute a request for "reasonable accommodation" within the ambit of the ADA.

The ADA defines discrimination to encompass an employer's failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(a). "A reasonable accommodation is 'one that enables a qualified individual with a disability to perform the essential functions of a position.'" *Scott v. Lori*, No. ELH-19-2014, 2020 WL 3833129, at *15 (D. Md. Jul. 8, 2020) (quoting *Jacobs*, 780 F.3d at 580) (internal quotation marks omitted); *see also Bertrand v. Town of Elkton*, No. RDB-17-3265, 2019 WL 5212804, at *5 (D. Md. Oct. 15, 2019) ("A reasonable

23

accommodation is 'that which presently, *or in the immediate future*, enables the employee to perform the essential functions of the job in question.'" (quoting *Myers v. Hose*, 50 F.3d 278, 283 (4th Cir. 1995) (emphasis added))). Accordingly, the employee must show that the requested accommodation would enable her to perform the essential functions of her role, *Wirtes v. City of Newport New*s, 996 F.3d 234, 238–39 (4th Cir. 2021); *see also Gaines v. Runyon*, 107 F.3d 1171, 1175 (6th Cir. 1997) (holding that an employee must show that "the requested accommodation was *necessary* in order for [her] to perform the essential functions of [her] job" (emphasis added)).[6]

The United States Court of Appeals for the Fourth Circuit has not addressed whether a request for FMLA leave may constitute a reasonable accommodation request within the ambit of the ADA. "Whether periods of leave may be considered a reasonable form of accommodation presents a 'troublesome problem, partly because of the oxymoronic anomaly it harbors.'" *Ainsworth v. Loudon Cnty. Sch. Bd.*, 851 F. Supp. 2d 963, 979 (E.D. Va. 2012) (citing *Garcia-Ayala v. Lederle Parenterals*, 212 F.3d 638, 651 (1st Cir. 2000) (O'Toole, J., dissenting)). Specifically, "an employee seeking FMLA leave is by nature arguing that he <u>cannot</u> perform the functions of the job, while an employee requesting a reasonable accommodation communicates that he <u>can</u> perform the essential functions of the job." *Acker v. Gen. Motors, LLC*, 853 F.3d 784, 791–92 (5th Cir. 2017) (emphasis altered). Accordingly, the Circuits are divided on this issue. *Compare id.* at 791–92 ("[R]equesting

---

[6] A *prima facie* case for failure to accommodate requires a plaintiff to show: "(1) that he was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position; and (4) that the employer refused to make such accommodation." *Wirtes*, 996 F.3d at 238–39; *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013). These elements are not applicable here, as Jackson does not allege that Sprint failed to accommodate her multiple sclerosis—rather, she contends that Sprint retaliated against her for requesting an accommodation.

FMLA leave alone is not a request for an ADA reasonable accommodation."), *with Capps v. Mondelez Global, LLC*, 847 F.3d 144, 156–57 (3d Cir. 2017) ("Under certain circumstances, a request for intermittent FMLA leave may also constitute a request for a reasonable accommodation under the ADA." (citing 29 C.F.R. § 825.702(c)(2))).

This Court has held that "a request for FMLA leave may serve as a request for reasonable accommodation." *Mattison v. Md. Transit Admin.*, No. JKB-21-00168, 2021 WL 4503566, at *8 (D. Md. Oct. 1, 2021); *see also Bertrand*, 2019 WL 5212804, at *5 ("In some cases, a temporary leave of absence may constitute a reasonable accommodation."); *EEOC v. Manu. & Traders Tr. Co.*, 429 F. Supp. 3d 89, 116–17 (D. Md. 2019) ("A reasonable accommodation may also include accrued paid leave or unpaid leave."). Chief Judge Bredar's recent decision in *Mattison v. Maryland Transit Administration*, No. JKB-21-00168, 2021 WL 4503566 (D. Md. Oct. 1, 2021), is instructive. In *Mattison*, the plaintiff was demoted, disciplined, and terminated by the Maryland Transit Administration after taking intermittent FMLA leave for his diverticulitis between 2012 and 2020. *See* 2021 WL 4503566, at **1–3.[7] In addition to sustaining FMLA interference and retaliation claims, *id.* at **6–7, Chief Judge Bredar embraced the Third Circuit's holding in *Capps v. Mondelez Global, LLC*, 847 F.3d 144 (3d Cir. 2017), and found that the employee had alleged a request for reasonable accommodation "in the form of a request for intermittent FMLA leave and notification to his supervisor that he was taking such leave," *id.* at *8.

---

[7] Among other allegations, the plaintiff contended that he was demoted two days after requesting FMLA leave in 2012, that he was written up as AWOL after taking thirty days' approved leave for a back surgery in 2015, and that he was terminated on January 13, 2021 after taking leave in September 2020. *Id.*

Jackson has offered sufficient evidence that her FMLA leave request fits the ADA's definition of reasonable accommodation. Courts in alignment with Chief Judge Bredar's view have recognized that a "prospective request for periodic FMLA leave" to accommodate "an ongoing ailment" may constitute a reasonable accommodation within the ambit of the ADA. *Isley v. Aker Phila. Shipyard, Inc.*, 275 F. Supp. 3d 620, 631 (E.D. Pa. 2017); *Beishl v. Cnty of Bucks*, No. 18-2835, 2018 WL 6812132, at *4 (E.D. Pa. Dec. 27, 2018). This reasoning is persuasive—prospective intermittent leave to accommodate a recurrent or chronic condition enables the afflicted employee to ameliorate their symptoms and expedite their return to work. *See also* 29 C.F.R. § 825.702(c)(2). Such is the case here. Jackson suffers from multiple sclerosis, "a chronic neurological condition" that occasionally renders her "too ill to work." (Jackson Dep. 214:8–12, 217:6–219:24; Certification 3–4.) She applied for prospective, intermittent FMLA leave in order to ameliorate her symptoms during MS episodes without "compromising her job"—and informed Leave Management that this leave is necessary to prevent her symptoms from escalating. (FMLA Application; Jackson Dep. 232:14–233:19.) Accordingly, a jury could find that Jackson engaged in activity protected by the ADA when she submitted "a request for intermittent FMLA leave and notification to [her] supervisor that [she] was taking such leave." *Cf. Mattison*, 2021 WL 4503566, at *8.

Accordingly, Jackson has presented a *prima facie* case for retaliation under the ADA. To rebut this *prima facie* case, Sprint again argues that Jackson was terminated due to her "persistent attendance and performance issues." (Mem. Supp. 21–23; Repl. Supp. 18–19.) For the reasons discussed in the analysis of the FMLA claim, Jackson has generated evidence to suggest that these justifications are pretextual—namely, that her managers have offered

conflicting statements regarding her performance and attendance, and that Sprint failed to follow its own progressive discipline process in advance of her termination. This showing is sufficient for Jackson to suggest that Sprint's explanation for her discharge is "unworthy of credence," creating a disputed issue of material fact best reserved for the jury. Accordingly, Sprint's Motion for Summary Judgment is hereby **DENIED** as to Count III.

## CONCLUSION

For the foregoing reasons, Sprint's Motion for Summary Judgment (ECF No. 37) is **GRANTED IN PART** and **DENIED IN PART.** Specifically, summary judgment is granted as to Count II, alleging disability discrimination in violation of the Americans with Disabilities Act, and denied as to Counts I and II, alleging retaliation.

A separate order follows.

Date: April 20, 2022                                   _____/s/_____
                                                                    Richard D. Bennett
                                                                    United States Senior District Judge